```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/22/2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

UNITED STATES                                               :

                        -v-                                 :            14 Cr. 705 (PAE)

                                                            :            OPINION & ORDER

CHRISTIAN GONZALEZ,                                         :

                                    Defendant.              :

------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

On July 2, 2014, two New York Police Department ("NYPD") police officers responded to an anonymous tip to the effect that a Hispanic male, wearing distinctive clothing and located at a particular intersection in the Bronx, was in possession of a silver pistol. Moments after arriving at that intersection, and after observing that a man matching that description had a suspicious bulge in his pants, the officers stopped, questioned, and ultimately arrested the man—defendant Christian Gonzalez.

Gonzalez, who was later indicted, now seeks to suppress (1) the gun that the officers recovered from his person, (2) crack cocaine that officers recovered from him during a later strip search at the police precinct, and (3) statements he made on both occasions. He argues, on three grounds, that his constitutional rights were violated: First, he argues that the officers lacked justification to stop him. Second, he argues that the officers lacked justification to conduct a strip search. Third, he claims that he was never informed of his *Miranda* rights.

For the following reasons, Gonzalez's motion to suppress is denied as to the gun and associated statements, but granted as to the narcotics and associated statements.

## I.       Procedural History

On July 2, 2014, Gonzalez was arrested.  On October 23, 2014, a Grand Jury returned an

Indictment, charging Gonzalez with (1) possession of a controlled substance, crack cocaine, with

intent to distribute it, and (2) possession of a firearm in furtherance of drug trafficking.  Dkt. 7.

On January 9, 2015, Gonzalez filed a motion to suppress physical evidence that police

officers obtained and statements he made on July 2, 2014, Dkt. 17, along with a supporting

memorandum of law, Dkt. 18 ("Def. Br."), a declaration by his counsel, Dkt. 19 ("Kaminsky

Decl."), and a sworn declaration from Gonzalez attesting to the events of July 2, 2014, Dkt. 20.

That declaration was amended on January 12, 2015.  Dkt. 21 ("Gonzalez Decl.").  On January

30, 2015, the Government submitted a memorandum of law in opposition, Dkt. 25 ("Gov. Br."),

and a sworn declaration from the arresting officer, Dkt. 26 ("Rios Decl.").

On March 31, 2015, the Court began a suppression hearing and heard testimony from

three witnesses.  *See* Dkt. 37 ("Tr.").  On May 20, 2015, the Court concluded that hearing and

heard argument.

## II.      Factual Findings

### A.       Evidence Presented

The facts found by the Court are based on the evidence adduced at the suppression

hearing, which principally consisted of the testimony of three police officers.[1]  Officers Luis

Rios and Anthony Grosso were present for the initial stop, questioning, and arrest.  Officers Rios

and Joshua Marte were present for the strip search at the police precinct, although only Officer

Rios was in position to testify as to the circumstances that led to the strip search.  Gonzalez

---

[1] On a suppression motion, the Government bears the burden of proof by a preponderance of the
evidence.  *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010).

submitted a sworn declaration before the hearing, but he did not testify.  The Court also received

several exhibits, namely, an audio recording of the police radio transmission, a stop-and-frisk

form completed by Officer Rios, the firearm and narcotics recovered from Gonzalez's person, an

audio recording of an Internal Affairs Bureau ("IAB") interview with Officer Rios, and various

photographs.

At the Court's request, the Government provided, and the Court received, supplemental

exhibits after the hearing, namely, a copy of the 49th Precinct's log book from July 2, 2014, a

report indicating the weight of the firearm seized from Gonzalez's pocket, Gonzalez's rap sheet,

an FBI log listing when police officers have searched for Gonzalez's rap sheet, and several

documents related to Officer Rios's internal disciplinary proceedings.  Dkt. 33, 35, 39.

### B.     Credibility of Officer Rios

A central issue as to both parts of Gonzalez's suppression motion is whether to credit the

testimony of Officer Rios.  Officer Rios's testimony at the suppression hearing raised substantial

issues as to his overall credibility.  The Court therefore addresses his credibility as a threshold

issue.  After giving the matter close attention, the Court, regrettably, finds that Officer Rios was

a sufficiently compromised witness that, except where his testimony was corroborated or had

other indicia of reliability, the Court cannot generally treat the controverted parts of his

testimony as truthful.  This conclusion has two bases.

#### 1.     Disciplinary Violations Bearing on Credibility

In his capacity as a NYPD officer, Officer Rios has pled guilty to three internal

disciplinary violations that bear on his trustworthiness.

First, Officer Rios pled guilty to wrongfully embellishing facts and circumstances

surrounding an allegation that another member of the NYPD struck him with a scooter.  Tr. 110.

Officer Rios had claimed that another officer, Officer Glynn, hit him with a police scooter outside of the 114th Precinct in Queens. Tr. 89–90. Officer Rios's original allegation was vivid and detailed; he asserted, for example, that Officer Glynn hit him so hard that he went flying into the air, Tr. 96, and that Officer Glynn smelled like alcohol, Tr. 103. Later, however, Officer Rios admitted and pled guilty to falsely making those accusations. Tr. 94.

Second, Officer Rios pled guilty to making accusations against other NYPD officers to the Civilian Complaint Review Board ("CCRB") and Office of Equal Employment Opportunity ("OEEO") with no legitimate purpose. Tr. 121. Specifically, Officer Rios had accused other officers, including supervisors, of harassing him on several occasions. Tr. 90–91. Again, he pled guilty to fabricating those allegations. Tr. 90, 121.

Third, Officer Rios pled guilty to interfering with an official NYPD investigation by lying to the IAB. Tr. 122–23. This charge arose out of the IAB's investigation of Officer Rios's allegations regarding harassment by other officers. Tr. 91. During an interview, Officer Rios told IAB investigators that he did not recall the substance of certain telephone conversations he had had with representatives from the CCRB and OEEO. *Id.* Officer Rios later admitted that, at the time of the IAB interview, he had, in fact, remembered the pertinent information and had falsely stated that he did not. Tr. 92.

## 2. False Testimony At, or Revealed By, the Suppression Hearing

Officer Rios's testimony at the suppression hearing was also problematic on its own terms. During that testimony, Officer Rios admitted to prior occasions in which he had given false testimony. Equally disquieting, several aspects of Officer Rios's testimony at the suppression hearing were, in the Court's judgment, untruthful.

First, Officer Rios, at the suppression hearing, testified that, as to two of the charges to which he pled guilty, those guilty pleas were false—*i.e.*, when he pled guilty before the IAB, he was lying. Tr. 94. Thus, Officer Rios testified, it had in fact been true that Officer Glynn had him with a scooter, Tr. 89, and so, when Officer Rios pled guilty before the IAB to wrongfully embellishing facts relating to that accusation against Officer Glynn, Officer Rios was lying, Tr. 110. Similarly, Officer Rios testified that he had, in fact, been harassed by other officers, Tr. 91, and he had accurately reported that harassment to the OEEO (but not the CCRB), Tr. 90–91. Thus, when Officer Rios later pled guilty before the IAB to making accusations about such harassment without a factual basis, he was again lying, *i.e.*, he was not guilty, Tr. 121. Officer Rios explained that he had falsely pled guilty before the IAB because he "wanted the case to be closed and put behind [him] for [him] to move forward." Tr. 92. To be sure, Officer Rios's testimony as to these two prior incidents left this Court uncertain on which occasion Officer Rios had lied: (1) when he entered his guilty pleas before the IAB, as he testified before this Court, or (2) when he testified before this Court to the effect that he had lied before the IAB. Regardless, Officer Rios's testimony at the suppression hearing revealed that, either before the IAB or before this Court, he had given untruthful testimony as to these important matters.[2]

Officer Rios's testimony to the effect that he had pled guilty twice despite being not guilty was sufficiently jarring that the Court explored, during this testimony, whether there was a rational explanation for doing so. The Court surmised that perhaps Officer Rios's original claim that he had been hit by the scooter of a drunken Officer Glynn had been true; that Officer Rios's

---

[2] The Court notes that Officer Rios was not placed under oath when he pled guilty before the IAB. *See* Dkt. 35, Ex. 1. The Court nevertheless concludes that lying about such important matters in a setting as serious as the IAB—where Officer Rios was represented by an advocate and spoke on the record—is highly relevant to his credibility.

accusation to that effect against Officer Glynn had triggered retaliatory harassment of him by

other officers; and that, to put an end to the harassment, Officer Rios ultimately decided to

renounce both his claim against Officer Glynn and his claim of harassment by other officers,

even though both those claims were true.  This theory would have accounted for why Officer

Rios had made his initial claims against Officer Glynn and his ensuing claim of harassment.  It

also would have explained Officer Rios's later decision, against his apparent self-interest, to

plead guilty to fabricating those claims.  However, Officer Rios did not account for his guilty

pleas in these terms.  On the contrary, when the Court pointedly asked Officer Rios whether he

had falsely pled guilty before the IAB to avoid harassment, Officer Rios responded, no, and

denied that the harassment he experienced was related to the scooter incident involving Officer

Glynn.  Tr. 94.  Officer Rios's testimony thereby foreclosed this relatively benign explanation

for his decisions to plead guilty.

As to the third charge to which he pled guilty, interfering with an official NYPD

investigation, Officer Rios did not dispute the factual basis for this plea.  He testified on direct

examination that he had lied to the IAB when he had stated that he did not remember certain

calls he had made to the OEEO.  Tr. 91–92.  Asked about this incident on cross-examination,

however, Officer Rios was evasive.  For example:

> Q.  Could you tell us how you interfered, sir?
> A.  By not continuing the investigation.
> Q.  That's how you interfered?
> A.  Yes.
> . . .
> Q.  Did you lie to the IAB?
> A.  In some ways.
> . . .
> Q.  Why don't you tell us what the some ways were.
> A.  Again, they transferred me to the Bronx to the 49 Precinct.  Due to the fact that
> way I plead guilty and the case gets closed, and it is put behind me and put away

and I could continue my service.  And I pleaded guilty to those charges, that way I
could continue doing what I do.
Q. That's not what this charge is, correct?
A. Which one?
Q. Charge no. 3, the charge that is wrongfully interfered with an official department
investigation.  You didn't plead guilty to that based on the facts you just recited,
correct?
A. What?
Q. Let me put it to you this way.  There were findings made against you that showed
you [how] you interfered with an official department investigation, correct?
A. I'm not sure what you are saying.

Tr. 122–23.  The Court's assessment is that Officer Rios's evasiveness in the face of these and

other fair questions regarding his lies to the IAB investigators reflected a deliberate refusal to

own up fully to his dishonesty before the IAB.

At other points, Officer Rios's testimony before this Court was demonstrably false.  Most

strikingly, Officer Rios adamantly, and repeatedly, insisted that he had never accused Officer

Glynn of being drunk.  Tr. 97, 98, 99, 101.  The following exchange is illustrative:

Q. Did you accuse Officer Glynn of being drunk when he hit you with the scooter?
A. No.
Q. Your testimony today under oath is that you did not say during your March 18th
phone call that Officer Glynn hit you when he was drunk.  Is that your testimony
today?
A. I never made a phone call and said that.
Q. My question, did you accuse Officer Glynn of being drunk when he hit you with
a scooter?
A. Again, I never said that.
THE COURT:  To be clear, at no point did you ever claim that Officer Glynn was
drunk when he hit you?
THE WITNESS:  Correct.
Q. Is that your testimony, sir?
A. Yes.

Tr. 97–98; see also Tr. 99 ("I never made that allegation" that Officer Glynn was "drunk when

he hit [Rios] with the scooter"); Tr. 101 ("I never accused him of being drunk").

On cross-examination, however, Officer Rios was confronted with an audio recording of

a 2009 interview of him by IAB investigators (DX A).  The recording of that interview reveals

7

that Officer Rios unambiguously told the IAB that Officer Glynn smelled like alcohol at the time of the alleged accident. Tr. 103. After that tape was played, Officer Rios admitted—as was unavoidable —that "[t]hat's what I said at the time." *Id.* But when questioned further, Officer Rios stated that he could not recall making that allegation. Tr. 107, 118–19.

This series of answers was incredible. It was apparent that the incident in which Officer Rios made accusations before the IAB as to Officer Glynn—ultimately leading to Officer Rios's guilty pleas—had been a searing experience in Officer Rios's professional life. Officer Rios, in fact, was later charged by the IAB with making that allegation falsely, pled guilty to doing so, and thereby faced significant punishment. *See* Tr. 126 (noting that Officer Rios lost 25 vacation days as a result of his plea and "easily" could have been fired); Dkt. 35, Ex. 1, at 1, 3 (identifying Officer Rios's penalty as "forfeiture of 25 vacation days and one year dismissal probation"). It defied credibility that Officer Rios could now deny (1) making such a serious allegation about Officer Glynn, and (2) recalling having done so. And, tellingly, Officer Rios, in pleading guilty, admitted that he "had continuously claimed that he didn't recall making those allegations" to the IAB, even when confronted with "the tape with his voice on it." Dkt. 35, Ex. 1, at 2. The conclusion is unavoidable: As to this point, Officer Rios gave false testimony to the Court, under oath, in response to multiple questions. *See* Tr. 97, 98, 99, 101, 107, 118.

Also problematic was Officer Rios's testimony that he could not remember (1) accusing a Lieutenant Morales of writing an accident report as to the scooter incident that wrongfully omitted that Officer Glynn was drunk, Tr. 112, 114, 115; or (2) the other NYPD internal disciplinary charges to which he has pled guilty, Tr. 128. And Officer Rios was evasive on other points. He initially acknowledged, for example, that the IAB had informed him that he was

8

under investigation.  Tr. 100.  But moments later, he claimed that he did not know whether the

IAB had been investigating him:

> Q. After the allegations you made, the IAB was starting to investigate you, correct?
> A. I don't know if they were investigating me personally.
> Q. Well, who were they interviewing?
> A. They were interviewing me but not investigating me, as far as I know.  I'm a little confused on this.
> Q. So it is your testimony today, under oath, that when the IAB came to your house you did not know that they were investigating allegations of misconduct against you?
> A. When they came to my house, correct?
> Q. Right.
> A. No.  I did not know.

Tr. 105; *see also* Tr. 107, 108.  The Court views Officer Rios's claim that he did not know that

he had been under investigation as particularly suspect:  As Officer Rios elsewhere admitted, he

had falsely told IAB investigators that he did not recall telephone calls that he made to the OEEO

complaining of harassment, whereas, in fact, he did remember those calls.  Tr. 91–92, 125.[3]

### 3.    Overall Assessment

The Court has carefully considered whether Officer Rios's testimony as to the events

involving defendant Gonzalez can be credited.  On the one hand, Officer Rios's false testimony

and false statements all related solely to his disciplinary history and dealings with other officers.

His demonstrable or admitted falsehoods did not concern the events at issue here specifically or

his police work in the field generally.  In fact, as the Government emphasized at argument,

---

[3] At other points during the suppression hearing and in his recorded IAB interview, Officer Rios recounted incidents that, as rendered, appeared improbable or exaggerated.  In one, Lieutenant Morales surreptitiously wadded up cash like a ball and kicked it near Officer Rios, trying to provoke him.  Tr. 129–30; DX A, at 37:56–49:24.  In another, the captain of the precinct folded up Officer Rios's timesheets and threw them in the garbage, trying to get Officer Rios in trouble.  Tr. 131–32; DX A, at 17:54–24:34.  The Court is, however, mindful that these incidents were touched on only briefly at the hearing.  In finding broader problems as to Officer Rios's credibility, therefore, the Court does not rely on this testimony.

Officer Rios's account of the initial stop and the mechanics of the strip search were generally corroborated by Officer Grosso and Officer Marte, respectively, suggesting that he was truthful as to those discrete events. But, in the Court's judgment, the taint from Officer Rios's record of mendacity cannot be cordoned off, topically or temporally. He has made too many falsehoods, in too many contexts, to permit such compartmentalization.

Particularly significant, Officer Rios lied before this Court, under oath, and was repeatedly evasive in the very suppression hearing at which he testified as to the events concerning Gonzalez. If the solemnity of testifying before this Court did not impress upon Officer Rios the need to tell the truth as to himself, there is no reason to treat his testimony as to another person, Gonzalez, as any more truthful. Certainly there is no reason to assume that his mendacity would be constrained by respect for Gonzalez's rights or interests. And, having closely scrutinized Officer Rios as he testified, the Court perceived that he was unacceptably casual, ironical, and dismissive. He did not appear to have approached courtroom testimony with anything like the necessary care.

The Court is, therefore, left with no confidence that any part of Officer Rios's testimony can be assumed to be true, at least as to any significant controverted fact. The Court therefore declines to credit his testimony, except insofar as that testimony is either corroborated by other evidence or is intrinsically reliable.

**B.    Facts Established**

Excluding the uncorroborated testimony of Officer Rios, the remaining evidence presented at the hearing established the following:

On July 2, 2014, an unidentified man called 911 and reported that he had seen a male with a silver pistol near the intersection of White Plains Road and Morris Park Avenue in the

Bronx, specifically, at a bus stop across the street from a Dunkin' Donuts.  Kaminsky Decl. ¶ 3.
The caller described the suspect as "Hispanic," "a little heavyset," and wearing "an American
flag shirt" and "gray sweatpants."  *Id.*  When asked for his name, the caller stated that he would
"rather stay anonymous."  *Id.*  The 911 operator relayed information about the call to the police
dispatcher.  *Id.* ¶ 4.  The police dispatcher, in turn, put out an alert.  *Id.* ¶ 5.

      At that time, Officers Rios and Grosso were in a police vehicle on routine patrol.  Tr. 13
(Grosso), 69 (Rios).  They received a "gun run," a police radio transmission reporting an active
situation involving a firearm.  *Id.*  The "gun run" stated that there was a man with a gun near the
intersection of White Plains Road and Morris Park Avenue in the Bronx, specifically, at a bus
stop across the street from a Dunkin' Donuts.  Tr. 14–15, 69; GX 1.  The suspect was described
as a heavyset, Hispanic male wearing an American flag t-shirt.  Tr. 15, 69; GX 1.  Within a
couple of minutes, Officers Rios and Grosso arrived at White Plains Road and Morris Park
Avenue, Tr. 16, where they saw only one person who matched the description given in the gun
run—a heavyset, Hispanic male wearing an American flag t-shirt.  Tr. 18, 31, 70.  From the
vehicle, Officer Grosso observed that the suspect, later identified as Christian Gonzalez, had "a
bulge and sag in his sweatpants pocket."  Tr. 19.

      Officers Rios and Grosso stopped their car in front of the Dunkin' Donuts and exited the
vehicle.  Tr. 19.  As they approached Gonzalez on foot, both officers had a clear view of the
bulge in Gonzalez's pants.  Tr. 20, 35, 71–72.  Although Officer Grosso could not make out the
shape of the bulge, he observed that it caused Gonzalez's "pants to sag to a certain extent that is
. . . not consistent with other items you would place in your pocket."  Tr. 35–36.  Officer Grosso
did not draw his weapon.  Tr. 20.  He could not recall whether Officer Rios drew his weapon, Tr.
37, and Officer Rios testified that he did not, Tr. 72.

When the officers reached Gonzalez, he was walking into oncoming traffic and attempting to cross the street. Tr. 21–22. Officer Grosso placed his hand on Gonzalez's arm or shoulder and guided him back to the sidewalk. Tr. 22.[4] In response to a question from one of the officers, Gonzalez stated that he had a gun in his right pocket. *See* Tr. 22–23, 33, 73; Gonzalez Decl. ¶ 8. At a safe portion of the roadway, Officer Rios held Gonzalez's hands behind his back, while Officer Grosso reached into Gonzalez's pocket and recovered the gun. Tr. 23, 73. The gun, which was silver in color, was later identified as an operable semiautomatic Bryco Arms .380 caliber pistol with a defaced serial number. Tr. 23, 39; GX 3. The officers then arrested Gonzalez and took him to the 49th precinct in the Bronx. Tr. 25, 73. Because Officer Rios was the arresting officer, Officer Grosso had no further contact with Gonzalez after they arrived at the precinct, did not voucher the gun, and did not complete any paperwork related to the arrest. Tr. 25–26, 40, 43–44.

At the precinct, Officer Rios detained Gonzalez in a small holding cell with one or two other arrestees. Tr. 147 (Rios); Gonzalez Decl. ¶ 10; *see also* GX 5 (photo of the holding cell). Gonzalez lay down on the narrow bench attached to the cell wall. Tr. 79; Gonzalez Decl. ¶ 11. At some point, Officer Rios approached Officer Marte for assistance conducting a strip search of Gonzalez. Tr. 47–48 (Marte).[5]

---

[4] Gonzalez's written declaration attested to a slightly different set of facts, including that at least one officer had his gun drawn and that the officers forcibly brought him to the back of the patrol car. Gonzalez Decl. ¶ 5. Because the Court found Officer Grosso's testimony quite credible, and because Gonzalez's claim was not subject to cross-examination, the Court credits Officer Grosso's account over Gonzalez's. *See, e.g., United States v. Calix*, No. 13 Cr. 582 (RPP), 2014 WL 2084098, at *1 n.1 (S.D.N.Y. May 13, 2014) (citing, *inter alia, United States v. Rodriguez*, 368 F. App'x 178, 180 (2d Cir. 2010) (summary order)); *United States v. Medina*, 19 F. Supp. 3d 518, 535 n.13 (S.D.N.Y. 2014) (collecting cases).

[5] The circumstances that gave rise to the strip search, which are disputed, are addressed below. *See* pp. 23–26, *infra.*

12

Officers Rios and Marte escorted Gonzalez into the bathroom next to the holding cells. Tr. 48–49, 80–81; Gonzalez Decl. ¶ 11.  At Officer Rios's direction, Gonzalez took off his shirt and pants, pulled down his underwear, opened his legs, and squatted.  Tr. 49, 81; Gonzalez Decl. ¶ 11.  As Gonzalez squatted down, a clear plastic package filled with a white substance fell out of his buttocks.  Tr. 49–50, 52–53, 81–82.[6]  The substance later tested positive for cocaine. Kaminsky Decl., Ex. B ("Compl.") ¶ 7.  Gonzalez told the officers "that's not mine," and "you found the gun but not the drugs."  *Id.* ¶ 6(v).  Officer Marte believed that Gonzalez was drunk during the search because he smelled like alcohol, and he was behaving in a talkative and hyperactive manner.  Tr. 54, 66.

Gonzalez attested that none of the officers advised him of his *Miranda* rights when he was arrested, or at any point before the strip search.  Gonzalez Decl. ¶ 12.

### III.  Discussion

Gonzalez moves to suppress the gun seized from his pocket during the initial stop, the narcotics recovered from his rectum during a later strip search, and statements made at both times.  The Court addresses Gonzalez's motion to suppress each item of physical evidence, along with the corresponding statements, in turn.

---

[6] Gonzalez's written declaration attested that nothing fell out of his buttocks when he squatted; rather, the officers forcibly lifted him up, leaned him against the sink, spread his buttocks, visually inspected his anus, and manually removed a plastic bag of crack cocaine from his rectum, a procedure that caused Gonzalez great discomfort.  Gonzalez Decl. ¶ 11.  Finding Officer Marte credible on this point, the Court credits Officer Marte's account as to where the narcotics were and rejects Gonzalez's account, which was not subject to cross-examination.  *See* n.4, *supra*.  However, because the Court suppresses the narcotics on the grounds that a valid justification for a strip search has not been established, this factual disagreement is immaterial.

A.      Gonzalez's Motion to Suppress the Gun

The Court must first determine whether the initial stop of Gonzalez qualified as a *Terry*

stop or an arrest. Depending on that determination, the Court must then resolve whether the

officers had reasonable suspicion to conduct a *Terry* stop, or probable cause to arrest Gonzalez.

1.      Whether the Initial Stop Was a *Terry* Stop or an Arrest

"In determining whether an investigatory stop is sufficiently intrusive to ripen into a de

facto arrest, the Second Circuit considers the 'amount of force used by the police, the need for

such force, and the extent to which an individual's freedom of movement was restrained, and in

particular such factors as the number of agents involved, whether the target of the stop was

suspected of being armed, the duration of the stop, and the physical treatment of the suspect,

including whether or not handcuffs were used.'" *United States v. Vargas*, 369 F.3d 98, 101 (2d

Cir. 2004) (quoting *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993)). "A permissible

investigative stop may become an unlawful arrest if the means of detention are 'more intrusive

than necessary.'" *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (citation omitted); *see*

*also United States v. Clark*, 552 F. App'x 40, 43 (2d Cir. 2014) (summary order) ("[T]he central

consideration is the officers' justification for their actions: acts that are typically inconsistent

with a mere stop, such as drawing a firearm, will not convert a stop into a de facto arrest if they

represent reasonable precautions in light of the circumstances."); *Posr v. Doherty*, 944 F.2d 91,

98 (2d Cir. 1991) ("Whether a seizure is an arrest or merely an investigatory detention, depends

on the reasonableness of the level of intrusion under the totality of the circumstances.").

Based on the credible testimony of Officer Grosso, the stop here was an investigative

detention. Centrally important, very limited time passed between when the officers initially

approached Gonzalez and when, having retrieved the gun from his pants, they placed him in

handcuffs and formally arrested him.  The actions taken by the officers during this brief time

window involved the use of only such force and display of authority as was reasonably necessary

under the circumstances.

At first, after having seen the bulge in Gonzalez's pocket, Officer Grosso placed his hand

on Gonzalez's arm or shoulder to lead him out of oncoming traffic.  As "it is well established

that officers may ask (or force) a suspect to move as part of a lawful *Terry* stop," this restraint on

Gonzalez's freedom of movement did not transform the stop into an arrest.  *United States v.*

*Gori*, 230 F.3d 44, 56 (2d Cir. 2000).

After Gonzalez, in response to an officer's question, stated that he had a gun in his

pocket, Officer Rios held Gonzalez's hands behind his back while Officer Grosso recovered the

weapon.  During this brief stop, the Court finds, Officer Grosso did not draw his weapon.[7]  And

the officers handcuffed Gonzalez only after recovering the gun from his pocket.[8]  Accordingly, at

---

[7] Officer Grosso could not recall whether Officer Rios drew his weapon, Tr. 37, and the Court
concludes that had Officer Rios drawn a weapon, Officer Grosso would likely have remembered
it.  The Court therefore does not credit Gonzalez's statement, which was not subject to cross-
examination, that at least one officer approached him with a gun drawn.  Gonzalez Decl. ¶ 5; *see
also* Tr. 72 (testimony of Officer Rios, denying that he drew his gun).  Even if Officer Rios had
drawn his weapon, that show of force would not have transformed the *Terry* stop into an arrest.
*See United States v. Garcia*, 339 F.3d 116, 119 (2d Cir. 2003) (citing *Perea*, 986 F.2d at 644)
(rejecting "the argument that a *Terry* stop necessarily becomes an arrest" if officers approach a
suspect "with guns drawn").  In approaching a suspect who is believed to be armed, it is
reasonable for a police officer to draw his weapon to ensure his own safety and the safety of
others in the vicinity.  *United States v. Newton*, 396 F.3d 659, 674 (2d Cir. 2004) ("'[A] law
enforcement officer conducting a *Terry* stop, when 'faced with the possibility of danger, has a
right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent
bystanders regardless of whether probable cause to arrest exists.'") (quoting *United States v.
Alexander*, 907 F.2d 269, 272 (2d Cir. 1990)).

[8] At that point, the officers plainly had probable cause to arrest Gonzalez.  *See United States v.
Bennett*, 13-2993, 2015 WL 897753, at *1 (2d Cir. Mar. 4, 2015) ("[D]iscovery of firearm during
lawful *Terry* stop can constitute probable cause to arrest for illegal possession of weapon."
(citing *United States v. Hensley*, 469 U.S. 221, 235–36 (1985)).

each step, the officers' conduct was no more intrusive than necessary to ensure their own safety, the safety of others in the vicinity, and, given his potential flight into oncoming traffic, Gonzalez's safety. *Compare United States v. Wiggan*, 530 F. App'x 51, 55 (2d Cir. 2013) (summary order) (holding that seizure was a stop, not an arrest, where police officers briefly handcuffed and searched a suspect who appeared to have a gun in his pocket), *with Oliveira v. Mayer*, 23 F.3d 642, 646 (2d Cir. 1994) (collecting cases holding that seizures qualified as arrests only where several officers surrounded suspects, brandished guns, isolated and interrogated suspects in police cruisers, and/or extensively searched suspects). The initial stop therefore qualified as an investigative stop, not an arrest.[9]

### 2.      Whether the Officers Had Reasonable Suspicion to Stop Gonzalez

The Court next inquires whether the investigative stop of Gonzalez was supported by reasonable suspicion of criminal activity. "The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (citations omitted). Reasonable suspicion must be based on something "more substantial than inarticulate hunches"; it requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). However, the reasonable suspicion standard is "not high." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). It is "'considerably less than proof of

---

[9] Because Gonzalez was not in custody when he stated that "it's in my right pocket"—*i.e.*, that he had a gun in his right pocket—rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), had not attached, and the officers were not required to obtain a waiver of rights before questioning him. *See Oregon v. Mathiason*, 429 U.S. 492, 494–95 (1977); *Newton*, 369 F.3d at 669. The Court therefore denies Gonzalez's motion to suppress that statement on the grounds that Gonzalez had not been Mirandized. *See* Def. Br. 23–24.

wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause.'" *Navarette*, 134 S. Ct. at 1687 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *see also United States v. Bailey*, 743 F.3d 322, 332 (2d Cir.), *cert. denied*, 135 S. Ct. 705 (2014); *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

"The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.'" *Navarette*, 134 S. Ct. at 1687 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). In evaluating the sufficiency of the information available, "the court must view the totality of the circumstances 'through the eyes of a reasonable and cautious police officer on the scene.'" *Bailey*, 743 F.3d at 332 (quoting *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)). Reasonable suspicion can arise from "information supplied by another person" as long as that information has sufficient "indicia of reliability." *Adams v. Williams*, 407 U.S. 143, 147 (1972).

Here, the initial tip conveyed to the officers—to the effect that a heavyset Hispanic man wearing an American flag t-shirt, near the intersection of White Plains Road and Morris Park Avenue, had a gun—was insufficient to supply reasonable suspicion because the tip came from a wholly anonymous caller. "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (quoting *White*, 496 U.S. at 329). Accordingly, in *J.L.*, the Supreme Court held "that no reasonable suspicion arose from a bare-bones tip that a young black male in a plaid shirt standing at a bus stop was carrying a gun." *Navarette*, 134 S. Ct. at 1688.

Upon arriving at the scene, the officers observed that a person matching the description provided, *i.e.*, a heavyset Hispanic male wearing an American flag t-shirt, was present. This fact,

however, also was insufficient to corroborate the anonymous tip: "That [a defendant] was the only individual in the area matching the description simply means that it was that much easier to 'correctly identify the person whom the tipster means to accuse.'" *United States v. Freeman*, 735 F.3d 92, 99–100 (2d Cir. 2013) (quoting *J.L.*, 529 U.S. at 272). "A stop based upon an anonymous tip is only warranted where the tip is established to be 'reliable in its assertion of illegality, not just in its tendency to identify a determinate person.'" *Id.* at 97 (quoting *J.L.*, 529 U.S. at 272); *see also Navarette*, 134 S. Ct. at 1688; *United States v. Peterson*, No. 12 Cr. 409 (PAE), 2012 WL 4473298, at *6 (S.D.N.Y. Sept. 28, 2012), *aff'd*, 559 F. App'x 92 (2d Cir. 2014) (summary order).

The officers' observation that Gonzalez had a bulge in his sweatpants pocket that caused his pants to sag to a significant degree, Tr. 19–20, 35–36, was, however, of a different character. Unlike a description of Gonzalez's clothing, it tended to corroborate the tipster's assertion that a person meeting Gonzalez's description was in possession of a gun. Such "personal observations made by the officers that corroborate information furnished by an unknown and unaccountable tipster may provide the basis for a reasonableness finding." *United States v. Muhammad*, 463 F.3d 115, 122 (2d Cir. 2006).

The Court has no difficulty crediting Officer Grosso's testimony—and the consistent testimony of Officer Rios—to the effect that they saw such a bulge in Gonzalez's sweatpants pocket and perceived it to be consistent with a gun and inconsistent with items commonly stored in a pocket. Tr. 35–36. This testimony was credible; it was not disturbed by cross-examination. And the officers' observation of a bulge in Gonzalez's sweatpants accords with common sense: As the Court could tell when it inspected the gun at the hearing, it was easily heavy and bulky enough—approximately one pound, two ounces unloaded, *see* Dkt. 33, Ex. 3—to significantly

weigh down, and create a bulge in, a suspect's sweatpants. *See United States v. Price*, No. 13

Cr. 216 (RRM), 2014 WL 558674, at *10 (E.D.N.Y. Feb. 11, 2014) (describing a .380 caliber

Bryco semi-automatic pistol as "heavy enough, without its magazine, to cause the pocket in a

pair of loose-fitting pants to sag").

       In similar cases, the Second Circuit has held that where there has been an anonymous tip

about a gun that has been corroborated by police observation of a bulge in the suspect's pants,

there is reasonable suspicion to justify a *Terry* stop.  In *United States v. Manuel*, 64 F. App'x 823

(2d Cir. 2003) (summary order), for example, the police received an anonymous tip that three

men with pistols were standing at a particular intersection in Buffalo, New York. *Id.* at 824.

When three officers arrived at the location minutes later, the intersection was deserted, but the

officers continued to patrol the area. *Id.*  About 20 minutes later, a person standing in the

doorway of a convenience store, whom the officers knew to be the owner of that store, waved to

the officers and pointed at another person standing across the street. *Id.*  When an officer

approached the specified person, he observed a bulge in the person's waistband. *Id.* at 825.  The

district court held, and the Second Circuit affirmed, that under these facts, the officer had

reasonable suspicion to stop the suspect. *Id.* at 825–26.

       Similarly, in *United States v. Wiggan*, 530 F. App'x 51 (2d. Cir 2013) (summary order),

the police received an anonymous tip that a man in a particular barbershop had a gun in his

pocket. *Id.* at 53.  Two officers responded to the dispatch, identified a man who fit the

description, and observed what appeared to be a pistol grip in the suspect's waistband. *Id.*

Given these facts, the district court held, and the Second Circuit affirmed, that the officers had reasonable suspicion to stop the suspect. *Id.* at 55–56.[10]

Courts outside the Second Circuit have similarly concluded that an anonymous tip about a firearm corroborated by police observation of a suspicious bulge provides reasonable suspicion for a stop. *See, e.g.*, *United States v. Samuels*, 131 F. App'x 859, 862–63 (3d Cir. 2005) (finding reasonable suspicion based on an anonymous tip, a bulge in suspect's waist band, and the suspect's nervous conduct); *United States v. Moroney*, 220 F. Supp. 2d 52, 59 (D. Mass. 2002) (finding probable cause—not merely reasonable suspicion—based on an anonymous call that accurately predicted suspect's movements and police observations of a bulge in the suspect's pants); *cf. Pennsylvania v. Mimms*, 434 U.S. 106, 111–12 (1977) (finding that officer was justified in conducting frisk for weapons after commencing lawful traffic stop, ordering suspect to exit the vehicle, and noticing a "large bulge" in the suspect's jacket). Further, the Second Circuit has found reasonable suspicion to justify a stop based on officers' observation of an apparent firearm alone. *See United States v. Lucas*, 68 F. App'x 265, 266–67 (2d Cir. 2003) (summary order) (officers observed suspect "mess around with his waistband" and saw "what appeared to be a revolver, handgun or something").

---

[10] This case is also far afield from those in which courts have found that the mere fact of "a generic bulge in a pocket" without more, does not supply reasonable suspicion for a stop, on the grounds that a bulge alone "can be explained by too many innocent causes to constitute 'reasonable' suspicion" of criminal activity. *See, e.g., Singleton v. United States*, 998 A.2d 295, 302 (D.C. 2010); *see also Price*, 2014 WL 558674, at *7 (finding no justification for a *Terry* stop where the testimony of both officers who claimed to have seen a bulge was "implausible"); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 614–15 (S.D.N.Y. 2013), *appeal dismissed* (Sept. 25, 2013) (holding that an officer's observation of a bulge that could be "a commonly carried object such as a wallet or cell phone does not justify a stop or frisk"). Here, the officers were acting on the basis of a tip that a man closely matching Gonzalez's description was carrying a gun. It is therefore entirely credible that they were scrutinizing Gonzalez's person for a bulge consistent with a gun, and the presence of such a bulge tended to corroborate the tip.

This case is closely analogous to *Manuel*, *Wiggan*, and the other cases canvassed above.[11] The officers here responded to an anonymous tip about a person with a firearm, spotted a person, Gonzalez, who closely matched the description given by the caller, and observed a suspicious bulge in his pocket that was consistent with a firearm. They therefore were justified in undertaking an investigative stop to determine whether, in fact, Gonzalez was carrying a firearm. The ensuing stop was brief, and Gonzalez quickly admitted that he was in fact carrying a gun, as Officer Grosso's search of his pocket confirmed. The investigative stop was no more intrusive than necessary to accomplish its valid purpose. The Court therefore finds that the officers had reasonable suspicion to stop Gonzalez, and denies Gonzalez's motion to suppress the gun seized from his person and the statements made during the stop.[12]

### B.   Gonzalez's Motion to Suppress the Narcotics

#### 1.   Applicable Legal Standards

"'Strip search' is often used as an umbrella term that applies to all inspections of naked individuals." *N.G. v. Connecticut*, 382 F.3d 225, 228 n.4 (2d Cir. 2004) (citation omitted). However, such searches vary in their level of intrusiveness: "One type of search requires that the subject remove all of his clothing and permit officers to inspect him while he stands, naked, in their presence. This is a 'strip search.' Another, more invasive type of search requires the subject to hold his buttocks open to allow officers to visually inspect his anus." *Fate v. Charles*,

---

[11] At argument, defense counsel correctly noted that investigative stops in some of these cases occurred at night in high-crime areas. *See, e.g.*, *Manuel*, 64 F. App'x at 824. But those facts cut both ways: On the one hand, they may provide some corroboration for an anonymous tip. On the other hand, Officers Rios and Grosso likely had a clearer view of the suspicious bulge and a more pressing need to secure the area than officers patrolling a dark street with few pedestrians.

[12] On the record before the Court, Gonzalez did not make any post-arrest statements regarding the gun. Accordingly, even accepting *arguendo* his claim that he was not advised of his *Miranda* rights, that omission is immaterial because there are no statements to suppress.

24 F. Supp. 3d 337, 344 (S.D.N.Y. 2014).  This type of search is known "as a 'visual body cavity search.'  Finally, the most invasive type of search, which crosses from a visual to a manual inspection of the subject's body cavity, is a 'manual body cavity search.'"  *Id.*; *see also Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 62 (2d Cir. 2009).

Before police officers conduct any strip search of an arrestee, "[t]he Fourth Amendment requires an individualized 'reasonable suspicion that [the] arrestee is concealing weapons or other contraband'" underneath his clothing.  *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) (quoting *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986)).  "'To establish reasonable suspicion, [officers] must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience.'"  *Id.* (quoting *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997)) (alteration in original).  Reasonable suspicion may be "based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest."  *Id.*  "[W]hether a particular strip search is constitutional 'turns on an objective assessment of the . . . facts and circumstances confronting [the searching officer] at the time' of the search."  *McBean v. City of New York*, 260 F.R.D. 120, 128 (S.D.N.Y. 2009) (quoting *Maryland v. Macon*, 472 U.S. 463, 470–71 (1985)) (alteration and omission in original) (emphasis omitted).[13]

The reasonableness of a search "'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  *United States v. Massey*, 461

---

[13] Although most of the relevant precedential cases involved misdemeanor arrestees, the same legal standards apply to strip searches of felony arrestees such as Gonzalez.  *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 166 (2d Cir. 2013) (Pooler, J., dissenting) (citing *Hartline*, 546 F.3d at 100–01); *Sarnicola v. County of Westchester*, 229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002); *see also Tennessee v. Garner*, 471 U.S. 1, 15 (1985) (describing the distinction between suspected misdemeanants and suspected felons as "untenable").

F.3d 177, 178 (2d Cir. 2006) (quoting *Samson v. California*, 547 U.S. 843, 848 (2006)).

Accordingly, to justify a more invasive search, police officers must have a stronger factual basis

underlying their reasonable suspicion. *See Fate*, 24 F. Supp. 3d at 350 ("[T]he scope of a search

bears directly on its reasonableness.") (citing, *inter alia*, *United States v. Barnes*, 506 F.3d 58, 62

(1st Cir. 2007); *People v. Hall*, 10 N.Y. 3d 303, 311 (2008)).

### 2.      Whether the Strip Search Was Reasonable

Officer Marte testified, credibly, that, to conduct the strip search, he and Officer Rios

escorted Gonzalez from the holding cell into the nearby bathroom.  He testified that, at Officer

Rios's direction, Gonzalez took off his shirt and pants, pulled down his underwear, opened his

legs, and squatted—a search more intrusive than a basic strip search but less intrusive than a

visual cavity search.  Tr. 49, 81.  The Court credits this account as truthful, and rejects

Gonzalez's unsworn claim that a more invasive manual body cavity search was undertaken.  *See*

Gonzalez Decl. ¶ 11.

However, centrally important, Officer Marte was not aware of the circumstances that

prompted that search.  *See* Tr. 47–48, 65.  Nor was Officer Grosso, who had left the precinct at

that point, aware of those circumstances.  Tr. 43–44.  Rather, only Officer Rios testified to the

facts that led him to conduct the search.

According to Officer Rios, he observed Gonzalez lying on his stomach on a bench in the

holding cell and moving his hands inside his sweatpants, around his buttocks.  Tr. 79.  While

Gonzalez was making these movements, Officer Rios heard the sound of crinkling plastic.  Tr.

79–80.  The movements and noises continued for several minutes.  *See* Tr. 79, 159, 174.  Officer

Rios testified that he then sought, and obtained, authorization of a precinct supervisor to

undertake a strip search of Gonzalez.  Tr. 80.

Officer Rios's account, if credited, would surely support a finding that the officers had reasonable suspicion to conduct the search. The sound of crinkling plastic, and the observation of hand movements by Gonzalez around his buttocks, together supplied a reasonable basis for a strip search. And the type of strip search conducted, which involved making Gonzalez remove his clothing and squatted so as to lead contraband to fall out from between his buttocks, was no more invasive than necessary.

Regrettably, however, the Court has found Officer Rios's testimony unworthy of credence except where corroborated or circumstantially self-evident. As to this point, the Government has not adduced any corroboration of Officer Rios's account. No other officer (or prisoner) testified that he heard the crinkling sound or saw the hand movements by Gonzalez to which Officer Rios attested.

As for the circumstantial logic of Officer Rios's account, it is fair to infer that *something* led Officer Rios to commission a strip search. It is improbable, in a case to that point solely of gun possession, that Officer Rios simply made a lucky guess that Gonzalez was housing drugs within his buttocks. And Officer Rios's account certainly might be true. On its terms, it is not inherently implausible: Gonzalez may well have been moving his hands around his buttocks and making a crinkling sound.

But his version of events is only one of the possible explanations for Officer Rios's decision to search Gonzalez. Conceivably he intensified his scrutiny of detainee Gonzalez for some other reason: an irritating or erratic remark or gesture made by Gonzalez, fidgeting by Gonzalez that less clearly justified a strip search, or a hunch based on the defaced serial number on the seized gun. It is also conceivable that Officer Rios was informed that Gonzalez's rap

24

sheet reflected prior convictions for narcotics offenses.[14]  Without *credible* testimony

affirmatively establishing the specific facts and circumstances that motivated the strip search, the

Court cannot find that the search was reasonable.  *See Hartline*, 546 F.3d at 100.[15]

       Given the Court's unwillingness to credit Officer Rios's stand-alone testimony on this

important point, the Court cannot find that the Government has carried its burden on a

suppression motion of establishing a lawful search by a preponderance of the evidence.

*Echevarria*, 692 F. Supp. 2d at 332; *see also United States v. Fadul*, 16 F. Supp. 3d 270, 287–88,

293 (S.D.N.Y. 2014) (finding no reasonable suspicion for a protective sweep and suppressing

evidence where officer's testimony about the search was not credible); *United States v. Williams*,

No. 11 Cr. 228 (RWS), 2011 WL 5843475, at *4–5 (S.D.N.Y. Nov. 21, 2011) (finding no

reasonable suspicion for a stop and suppressing evidence where officer's testimony was not

credible, including because of his involvement in ticket fixing and his dishonesty about those

incidents); *United States v. Rivera*, 543 F. Supp. 2d 335, 336, 338 (S.D.N.Y. 2008) (finding no

reasonable suspicion for a frisk and suppressing evidence where officer's testimony "was riddled

---

[14] The records produced by the Government indicate that both the NYPD Intelligence Division and the Firearms Suppression Division ran Gonzalez's rap sheet on the night of his arrest.  Dkt. 33, Ex. 5–6.  Although Officer Rios did not himself run the rap sheet, it is conceivable that he learned of Gonzalez's criminal history from an officer in one of those divisions.

[15] Although not necessary to this decision, aspects of Officer Rios's testimony explaining the basis for the strip search suggested a degree of imprecision or perhaps hyperbole.  According to Officer Rios, Gonzalez—a "heavyset" man, Tr. 15—was lying face-down on a narrow (approximately 15-inch wide) bench attached to the holding cell wall, *see* GX 5, and was making significant movements with his "whole body," Tr. 153, including "jerking himself up" and moving "back and forth," Tr. 175, while paying no attention to the one or two other inmates in the small holding cell or to Officer Rios, who by his own account was studying Gonzalez from an arm-length away for several minutes, *see* Tr. 159, 174.  Even though Gonzalez was under the influence of alcohol that evening, *see* Tr. 54, 66 (Marte), it is not clear to the Court that he would have been quite so oblivious to the presence of others while fiddling with the crack cocaine between his buttocks as Officer Rios recounted.

with exaggerations and was contradicted"); *United States v. Randolph*, 958 F. Supp. 167, 170

(S.D.N.Y. 1997) (finding no reasonable suspicion for a pat down and suppressing evidence

where officers' testimony about the investigative stop was not credible).  The Court therefore

grants Gonzalez's motion to suppress the narcotics.

      The Court must also therefore grant Gonzalez's motion to suppress the statements he

made during that search, *see* Compl. ¶ 6(v) (alleging that Gonzalez stated "that's not mine" and

"you found the gun but not the drugs" when the narcotics fell out of his rectum), as fruits of the

unjustified strip search, *see, e.g.*, *United States v. Haqq*, 213 F. Supp. 2d 383, 385 n.3 (S.D.N.Y.

2002) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).[16]

## CONCLUSION

      For the foregoing reasons, Gonzalez's motion to suppress is granted in part and denied in

part.  The Clerk of Court is directed to terminate the motions pending at docket 17 and 33.


SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge


Dated: May 22, 2015
      New York, New York

---

[16] The evidence adduced at the suppression hearing indicated that Gonzalez made the statements "that's not mine" and "you found the gun but not the drugs" spontaneously, not in response to an officer's question. *See* Compl. ¶ 6(v); Gonzalez Decl. ¶ 5.  Admitting those statements would not violate Gonzalez's Fifth Amendment rights under *Miranda*, which applies only to custodial interrogations.  384 U.S. at 444.  Instead, the Court suppresses these statements because they were not obtained "by means sufficiently distinguishable to be purged of the primary taint," *Wong Sun*, 371 U.S. at 488 (citation omitted), to wit, the strip search.

26